**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**Bid Protest**
**(Filed: July 31, 2008)**

| | | |
|---|---|---|
| DYONYX, L.P. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-458C |
| | ) | (Judge Christine O.C. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF DYONYX L.P.'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 52.1(b) of the Rules of the Unites States Court of Federal Claims ("RCFC"), Plaintiff DYNONYX, L.P. ("DYONYX"), respectfully requests that the Court enter Judgment on the Administrative Record in favor of Plaintiff DYONYX.

In support of its motion, DYONYX relies upon (i) the Administrative Record filed with the Court on July 9, 2008; (ii) the Statement of Facts filed by DYONYX as set forth herein; and (iii) the following Brief.

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iv

STATEMENT OF THE CASE ........ 1

JURISDICTION AND STANDING ........ 1

STATEMENT OF FACTS ........ 3

I. The Agency's Need ........ 3

II. The Solicitation's Evaluation Factors and Rating Scheme ........ 4

III. The DYONYX Proposal ........ 9

IV. The Agency's Discussions with DYONYX. ........ 9

V. DYONYX Final Proposal Revision ........ 10

VI. Competitive Range Determination Memo. ........ 11

VII. The Agency's Award Decision and Debriefing. ........ 14

STANDARD OF REVIEW ........ 16

SUMMARY OF ARGUMENT ........ 16

ARGUMENT ........ 18

I. [redacted] Was Contrary to Law and Regulation Because it was Based Upon a Responsibility-type Factors. ........ 18

[redacted] ........ 20

B. [redacted] ........ 21

C. The Agency's Failure to [redacted] is Contrary to Law and Regulation. ........ 22

II. It Was Arbitrary and Capricious for the Agency to Base [redacted] on Inaccurate Information. ........ 23

REDACTED VERSION

A. Awarding [redacted] is Arbitrary and Capricious Because it is Unsupported by the Record................. 23

B. The Agency's Finding [redacted] is Arbitrary and Capricious Because it is Unsupported by the Record. ....................... 24

C. The Agency's Determination that [redacted] was Arbitrary and Capricious. ......................................................................................... 25

D. The Agency's Determination that [redacted] was Arbitrary and Capricious......................................................................................... 26

E. Rating [redacted] is Arbitrary and Capricious Because it is Unsupported by the Record......................................................... 27

F. Rating [redacted] is Arbitrary and Capricious Because it is Unsupported by the Record. ............................................................... 28

III. The Source Selection Authority's Failure to Make an Independent Judgment is Contrary to Law and Regulation......................................................................................... 30

CONCLUSION........................................................................................................... 31

# TABLE OF AUTHORITIES

## Cases

*Aeroplate Corp. v. United States*, 67 Fed. Cl. 4, 7 (Fed. Cl. 2005) ............................................ 23

*Bean Stuyvesant, LLC v. United States*, 48 Fed.Cl. 303, 339 (2000) ......................................... 18

*Chapman Law Firm Co. v. United States*, 71 Fed.Cl.124, 132 (2006 ......................................... 18

*CHE Consulting, Inc. v. United States*, 74 Fed. Cl. 742 (2006) .................................................. 16

*Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324 (Fed.Cir. 2001) ........................................................................................................................ 2, 16, 23

*Info. Scis. Corp. v. United States,* 73 Fed. Cl. 70, 120 (Fed. Cl. 2006) ....................................... 30

*Myers v. United States*, 275 F.3d 1366, 1370 (Fed.Cir.2002) ...................................................... 2

*Pikes Peak Family Housing, LLC v. United States*, 40 Fed.Cl. 673, 678 (1998) ........................ 18

*Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C.Cir.1994) .................................. 23

*Stapp Towing Inc. v. United States*, 34 Fed. Cl. 300, 302 (1995)); ............................................ 23

## GAO Decisions

*Capitol CREAG LLC*, B-294958.4, January 31, 2005 ......................................................... 20, 23

*Great Lakes Dredge & Dock Company*, B-290158, June 17, 2002............................................ 19

## Statutes

5 U.S.C. § 706.......................................................................................................................... 16

28 U.S.C. § 1491 .................................................................................................................... 1, 16

31 U.S.C. § 3551 .......................................................................................................................... 2

**Regulations**

FAR 15.306 .......... 18

FAR 15.308 .......... 30

**Treatises**

Cibinic and Nash, Formation of Government Contracts, 3rd Ed. 1998, p. 545 .......... 19

REDACTED VERSION

## STATEMENT OF THE CASE

DYONYX currently provides information technology ("IT") support services to the Millennium Challenge Corporation ("MCC" or the "Agency"). On November 21, 2007, the Agency issued Request for Proposal ("RFP") No. MCC-08-0020-RFP-45, IT Services (the "Solicitation"), for the IT support services DYONYX currently provides. DYONYX submitted a timely proposal and, despite the fact that it is successfully providing these services, the Agency determined that DYONYX's proposal was [redacted] MCC also found [redacted] Computer Sciences Corporation ("CSC"), MCC had additional discussions with it and eventually awarded CSC the contract. DYONYX had been successfully operating the contract for over 40 months, and had submitted a bid price of [redacted], which was [redacted] than the contract price offered by CSC. DYONYX asked for a debriefing, which the Agency gave by telephone on May 23, 2008.

## JURISDICTION AND STANDING

This Court has jurisdiction over bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1), as amended by the Administrative Dispute Resolution Act of 1996. The Tucker Act grants the Court jurisdiction over "an action by an interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement." 28 U.S.C. § 1491(b) (1).

REDACTED VERSION

To establish the requisite standing to challenge a contract award, a disappointed bidder must show that it was an "interested party." To qualify as an "interested party," the plaintiff must show that it has a "direct economic interest [that] would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2) (2000). This involves an inquiry into prejudice.

Establishing standing prejudice depends on various factors including the relief the protester seeks. Where a protester seeks relief in the nature of a re-solicitation of the procurement, standing exists by the mere showing that a protestor could compete for the contract to be awarded by that re-solicitation.

> In *Impresa* we considered the standard to be applied where the plaintiff claims that the government was obligated to rebid the contract (as contrasted with a situation in which the plaintiff claims that it should have received the award in the original bid process). To have standing, the plaintiff need only establish that it "could compete for the contract" if the bid process were made competitive. [Citations omitted.]

*Myers v. United States*, 275 F.3d 1366, 1370 (Fed.Cir.2002).

The quoted case, *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324 (Fed.Cir. 2001), establishes the additional point that, where the Government would be obligated to rebid the contract, and the protester could compete for the contract once again, the protester "has a 'substantial chance' of receiving the award and an economic interest and has standing to challenge the award" thus establishing not only "standing prejudice" but also "merits prejudice." *Id.* at 1334.

If Plaintiff DYONYX has been improperly [redacted], the proper remedy would be for the Court to remand the case to the MCC to go through the process

[redacted], a process in which DYONYX would compete. Accordingly, there is a substantial chance of DYONYX receiving the award, but for MCC's errors [redacted] Therefore, DYONYX is an interested party and has standing to bring this bid protest.

## STATEMENT OF FACTS

### I. The Agency's Need.

1. MCC is a U.S. Government corporation established in 2004 designed to work with some of the poorest countries in the world. According to the Performance Work Statement, "MCC is based on the principle that aid is most effective when it reinforces good governance, economic freedom and investments in people. MCC's mission is to reduce global poverty through the promotion of sustainable economic growth." AR 3.

2. On November 21, 2007, the Agency issued Request for Proposal ("RFP") No. MCC-08-0020-RFP-45, IT Services for the Millennium Challenge Corporation (the "Solicitation"). AR 107-275.

3. According to the RFP, the Agency required:

> [T]he services of a Contractor to provide information technology infrastructure operations and related services that will provide the MCC with a full range of IT services that are stable, reliable, and responsive to the needs of the MCC. The contractor shall furnish all required means and methods (including, but not limited to, qualified personnel, facilities, equipment, materials, services, supervision, documentation, tools, and training in accordance with Federal law and Government/MCC/industry standards) which are necessary to meet the requirements of this Task Order.

AR 108.

4. The Agency invited vendors holding contracts under General Services Administration ("GSA") Federal Supply Schedule ("FSS") 70, under SIN 132-51 to submit offers. AR 108.

5. According to the solicitation, the

> resulting GSA task order will be performance-based to provide the Contractor with the flexibility to propose their own unique solution to satisfy MCC's requirement and to continuously improve processes and customer focus over the life of the contract, so long as the required outcomes are achieved through supervision, management, technical expertise, and resources necessary to ensure efficient administration of the work performed.

AR 108.

6. The Agency required the winning contractor to

> provide customer support that serves as a single, centralized source to MCC users that shall include necessary personnel, facilities, materials, equipment, service desk, desktop/laptop workstations, commercial-over-the-counter ("COTS") and system software, backup and restore operations, remote access processes, hosting services, and related services necessary to successfully provide the services described in the Performance Work Statement [("PWS")].

AR 108.

7. The solicitation would result in award of a fixed-price, award fee ("FPAF") contract. The contract had an Indefinite-Delivery, Indefinite Quantity ("IDIQ") component "for additional undefined requirements to support the IT services that are within the scope of the Task Order. As needed, the MCC will issue either fixed priced or time and materials task orders to cover these additional requirements." AR 108.

8. Currently, IT support is provided by DYONYX.

**II. The Solicitation's Evaluation Factors and Rating Scheme**

9. The Solicitation stated that the Agency would award a contract on the basis of best value to the Agency using the tradeoff process. The non-price factors, when combined, were significantly more important than price. These non-price factors were technical capability, past performance and business/price. Technical capability was more important than past performance; when combined, technical capability and past performance were more important than price. AR 176.

10. The technical evaluation subfactors, in declining order of importance, were the following:

> Technical Capability and Soundness of Approach – Offeror's understanding of MCC's needs as described in the PWS, overall qualifications for providing the required services and the soundness of the Offeror's proposed technical approach and solution to meet MCC's requirements, including proposed deliverables in PWS Para. C.6, the Quality Assurance and Control Plan, Transition Plan, and IT Security Plan, to provide required services and meeting MCC's performance objectives.
>
> Performance Management – The degree to which the Offeror demonstrates their ability to achieve the minimum performance objectives in Attachment J.3. This includes describing how they will implement and manage the contract, provide effective management to activities in multiple locations, effectively utilize staff, and subcontractors, to meet MCC needs for support, implement effective processes for integrating and maintaining MCC systems and applications, ensure integrity and security of MCC data, efficiently transition MCC operations to and from the Offeror's facility, and communicate and report to MCC on the status of program activities.
>
> Performance Improvement AF Plan – The degree to which the Offeror demonstrates commitment to performance improvement (e.g. increase response time to customers, optimization of services, identification and mitigation of potential risks).
>
> Staffing – Offeror's discussion on their proposed staffing and recruiting activities to include minimum qualifications of proposed staff (to include IDIQ categories) and staff resources to meet MCC's needs.

AR 176-77.

11. Technical proposals would be rated according to the following scale:

> Outstanding (O): Proposal very significantly exceeds the most important factors in a way that is beneficial to the agency. Risk is very low, and the proposal indicates a very high probability of successful performance. There are no deficiencies in major subject areas of the PWS/RFP.
>
> Good (G): Proposal meets or exceeds the most important factors in a way that is beneficial to the agency. Risk is low, and the proposal indicates a high probability of successful performance. There are no deficiencies in major subject areas of the PWS/RFP.
>
> Acceptable (A): Proposal meets all significant standards. Risk is low, and there is a good probability of success. There are no critical deficiencies; any deficiencies present can be readily corrected (and must be prior to award).
>
> Marginal (M): Some important standards have not been met. Risk is evident, and there is a low probability of success. There are serious deficiencies in the proposal, but they are correctable (and must be corrected prior to award).
>
> Unacceptable (U): Several important standards have not been met. Risk is high, and there is little likelihood of success. The proposal would have to be completely rewritten to make it acceptable.

AR.177-78.

12. Under the past performance evaluation, the Agency would evaluate

> an Offeror's present and past work record to assess the Government's confidence in the Offeror's probability of successfully performing as proposed. The Government will evaluate the Offeror's demonstrated record of contract compliance in supplying products and services that meet user's needs, including cost and schedule. Each relevant contract shall have been performed during the past three (3) years from the date of issuance of this solicitation. The Past Performance Evaluation will be accomplished by reviewing aspects of an Offeror's recent and relevant present and past performance, focusing on and targeting performance which is relevant to Technical Capability and the Cost Factors. The MCC will assess relevancy of the past performance to the proposed acquisition.

AR 178.

13. When rating an offeror's past performance, the Agency would use the following scale:

| | |
|---|---|
| Low Risk | Based on the Offeror's performance record, essentially no doubt exists that the Offeror will successfully perform the required effort. |
| Moderate Risk | Based on the Offeror's performance record, some doubt exists that the Offeror will successfully perform the required effort. |
| Unknown Risk | No relevant performance record is identifiable upon which to base a meaningful performance risk prediction. A search was unable to identify any relevant past performance information for the Offeror or key team members subcontractors or their key personnel. This is neither a negative or positive assessment. |
| High Risk | Based on the Offeror's performance record, significant doubt exists that the Offeror will successfully perform the required effort. |

AR 178.

14. With regard to "Staffing," the Solicitation identified three staff positions, program manager, senior on-site network engineer, and senior on-site help desk manager, as key personnel. AR 196.

15. Section C.5.1 of the Performance Work Statement provides, in part, "Key personnel shall be certified and meet all requirements of the position [redacted]

16. Section C.5.3 of the Performance Work Statement provides, in part, that "Incumbent Contractor personnel that transition to the new contract who lack required certifications, as listed above for their area of responsibility, shall be granted a 90-day grace period from the effective date of the contract to obtain the required credentials." AR 198.

REDACTED VERSION

17. Amendment A02 to the Solicitation confirmed that offerors may team with GSA FSS contract holders:

> Per GSA guidelines, two or more GSA Schedule contractors may work together, by complementing each other's capabilities, to offer a total solution to meet an ordering activity's requirement. The partners do not have to be under the same SIN but the requirements provided must be on a GSA FSS. If the prime vendor does not partner with another GSA FSS schedule holder nor have the full requirements under SIN 132 51 or any of its own GSA FSS's under other SINs, then [it] is incumbent upon the contractor to ensure these additional services are added to their SIN 132 51 schedule with GSA. No open market items can be permitted.

AR 292.

18. Amendment A04, issued prior to submission of final proposal revisions, reiterated the Agency's approval of teaming: "No 'open market' items may be proposed on this effort per GSA guidelines. Offerors should team up with other GSA vendors to provide items not listed on their own schedule." AR 424.

19. [redacted]

20. Price would be evaluated as follows:

> Price will be evaluated for realism and reasonableness for the proposed effort. MCC will assess the Offeror's pricing for:
>
> Base Period CLIN for Firm Core Requirements
> Base Period IDIQ CLIN
> Option CLIN for both Firm Core Requirements and IDIQ CLIN
> Profit strategy for the Fixed Priced and Award Fee (All CLIN).

AR 179.

REDACTED VERSION

**III. The DYONYX Proposal**

21. DYONYX submitted a timely offer. AR 426-864.

22. The offer described its key personnel including names and qualifications in narrative form as well as in table format. AR 483-92.

23. Since DYONYX was successfully performing the contract, for which the Agency was seeking a follow-on contract, [redacted] AR 755-60.

24. DYONYX's price proposal indicated that [redacted] AR 791.

**IV. The Agency's Discussions with DYONYX.**

25. After concluding that DYONYX had one of the highest rated proposals, the Agency initially put DYONYX in the competitive range and engaged in discussions with DYONYX. AR 1909.

26. The Agency asked DYONYX for additional information regarding the DYONYX key personnel described in its technical proposal. Specifically, the Agency stated [redacted] AR 1933-34.

27. The Agency's [redacted] were also described in its comments on DYONYX's price proposal.

[redacted]

[redacted]

[redacted]

[redacted]

AR 1936.

28. The Agency also provided DYONYX with a past performance report regarding its work on the incumbent contract. [redacted] AR 1941-48.

29. Since DYONYX's proposal indicated that [redacted]

[redacted].

AR 1938.

30. The initial past performance information on DYONYX resulted in [redacted] AR 1832.

**V. DYONYX Final Proposal Revision**

31. Pursuant to the Agency comments, DYONYX revised its proposal to incorporate additional information.

32. DYONYX revised its proposal to show [redacted] AR 2016-23.

33. In addition, DYONYX revised its proposal to show that [redacted] 2126-27.

34. Also, DYONYX challenged the [redacted]

[redacted]

AR 1953.

**VI. Competitive Range Determination Memo.**

35. Upon evaluating final proposals, the Agency [redacted] AR 2564.

36. In the Competitive Range Determination Memo, the Agency stated that [redacted]

[redacted] AR 2566.

37. The Competitive Range Determination Memo also concluded that [redacted] AR 2566. The Administrative Record does not support this statement.

38. The Competitive Range Determination Memo also stated [redacted] AR 2566. The Administrative Record does not support this statement.

39. The Solicitation required [redacted] AR 196 (emphasis added).

40. The Solicitation did not require [redacted]

41. The Agency also found that DYONYX was [redacted] AR 2570.

42. The Competitive Range Determination Memo provided:

[redacted]

[redacted]

AR 2570.

43. There was no requirement [redacted]

44. On information and belief, [redacted]

45. The Agency concluded [redacted] AR 2571.

46. The Executive Summary description [redacted] AR 2564.

47. The Executive Summary description stated that the [redacted] AR 2566.

48. The revised proposal of CSC was [redacted] AR 2571.

49. The solicitation required [redacted] AR 399.

50. The evaluators reviewing [redacted]

[redacted] AR 2489.

51. The consensus evaluation labeled [redacted] AR 2489.

**VII. The Agency's Award Decision and Debriefing.**

52. On May 20, 2008, the Agency informed DYONYX that the contract had been awarded to CSC at a price of [redacted] AR 2936.

53. The DYONYX price was [redacted] AR 2936.

54. Although the Agency told DYONYX that [redacted], the Agency also provided DYONYX [redacted] AR 2483.

55. The Agency award letter told DYONYX that [redacted] AR 2936.

56. Of the three performance evaluations [redacted] AR 1831-32.

57. The Agency concluded [redacted]

REDACTED VERSION

[redacted]

AR 1832.

58. The Agency award letter stated the following:

[redacted]

AR 2936.

59. DYONYX asked for a debriefing, which the Agency gave by telephone on May 23, 2008. 3133-34.

60. At the debriefing, the Contracting Officer, Mr. Young, [redacted] AR 3139.

61. At the debriefing, Mr. Young also mentioned [redacted] AR 3139.

62. DYONYX had been successfully operating the contract for over 40 months.

## STANDARD OF REVIEW

The Court reviews the Agency's decision under the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4). That statute provides, in part, that "[t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

In deciding whether an Agency decision is arbitrary and capricious the Court must consider whether a rational basis for the Agency's decision was lacking or a violation of an applicable regulation or procedure occurred during the procurement process. *Impresa Construzioni*, 238 F.3d at 1333. The Court must determine:

> whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion. . . . For an agency's decision to be irrational, the court must find that the agency entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*CHE Consulting, Inc. v. United States*, 74 Fed. Cl. 742 (2006) (internal punctuation and citations omitted).

## SUMMARY OF ARGUMENT

The Agency's decision to [redacted] was based in part [redacted] DYONYX's proposal stated that [redacted]

[redacted] The Agency's concern whether DYONYX would be able to perform as promised is an issue of responsibility. [redacted] on the other hand is determined on the basis of technical acceptability. [redacted]

The Agency also based its decision to [redacted] on several erroneous factual assumptions, which were contradicted or unsupported by the Administrative Record. Most notably, the Agency assigned [redacted] These assumptions are clearly contradicted by the record, and therefore the Agency's decision [redacted] on these bases is arbitrary and capricious. The Agency also [redacted] Additionally, the Agency's rating of [redacted] and therefore arbitrary and capricious.

Finally, it is apparent that the Source Selection Authority did not exercise independent judgment in reaching his decision. [redacted]

[redacted] the SSA's rote approval, without comment or analysis, of the flawed decision documents resulted in prejudice to DYONYX.

## ARGUMENT

**I. [redacted] Was Contrary to Law and Regulation Because it was Based Upon a Responsibility-type Factors.**

Federal law and regulations require an Agency to establish the competitive range based on the Government's evaluation of proposals as described in the RFP. FAR 15.306(c)(1). In this case, the Agency found [redacted] *Chapman Law Firm Co. v. United States*, 71 Fed.Cl.124, 132 (2006) [redacted] (citing *Bean Stuyvesant, LLC v. United States*, 48 Fed.Cl. 303, 339 (2000); *Pikes Peak Family Housing, LLC v. United States*, 40 Fed.Cl. 673, 678 (1998); *Birch & Davis Int'l, Inc. v. Christopher*, 4 F.3d 970, 974 (Fed.Cir.1993)).

A [redacted] involves determining whether the proposals are technically acceptable. When the Agency excluded [redacted] it incorrectly applied the law and the terms of the Solicitation regarding responsiveness.

The Solicitation provided the following definition of responsiveness:

> To be responsive, the Offeror must address all the requirements of the solicitation and must include all information specifically required in all sections of the

REDACTED VERSION

> solicitation. The Offeror must state how it will meet the requirements; however, simply repeating the words of the RFP is not acceptable.

AR 176.

Questions of responsiveness, or technical acceptability, are often confused with the issue of responsibility. Responsiveness and responsibility are distinguished in the following manner:

> Responsiveness . . . deals with the question of whether the contractor *has promised to do exactly what the government has requested.* Responsibility, however, involves the question of whether the contractor *can or will perform as it has promised.*

Cibinic and Nash, Formation of Government Contracts, 3rd Ed. 1998, p. 545. The question of responsiveness is therefore determined based upon the face of the offer, and any subsequent discussions held with the offeror, and addresses whether the offeror has promised to meet the requirements of the solicitation. The issue of responsibility, however, is determined "on the basis of all information that may be submitted or available up to the time of award," *id.*, and concerns the capability of the offeror. The issue of capability is a responsibility issue that is required to be referred to the SBA when a small business is involved.

This distinction between responsibility and responsive can be a confusing, particularly when the Agency requests information "concerning bidder's responsibility characteristics – such as the requirement for submission of information relating to responsibility." *Id.* This view is shared by the Government Accountability Office (GAO): "The terms of a solicitation cannot convert a matter of responsibility into one of responsiveness." *Great Lakes Dredge & Dock Company*, B-290158, June 17, 2002.

In this case, the Agency confused the questions of responsiveness and responsibility. It concluded [redacted]

[redacted] "Where . . . a finding that a small business offeror's proposal is unacceptable under a responsibility-type criterion precludes such a comparative or [cost/technical] tradeoff analysis, it is tantamount to a nonresponsibility determination." *Capitol CREAG LLC*, B-294958.4, January 31, 2005.

The Agency's decision to exclude DYONYX based upon its concern over whether DYONYX would be able to perform as promised is contrary to law and regulation because the Agency improperly applied responsibility-type factors. Additionally, the Agency's failure to refer the responsibility determination to the SBA constitutes a violation of law and regulation. Therefore, the Court should find in favor of DYONYX, and remand the case to the Agency to [redacted] and refer the issues of responsibility to the SBA.

**A.** [redacted]

The Solicitation identified as key personnel the program manager, senior onsite network engineer, and senior onsite help desk manager, [redacted] AR 196 (emphasis added). DYONYX's initial offer [redacted] Following discussions with the Agency [redacted] DYONYX's revised proposal stated that [redacted]

Because DYONYX's revised proposal addressed [redacted]

Nevertheless, the Agency persisted in finding [redacted] However, the Solicitation did not [redacted] Whether DYONYX would be capable of performing as it had promised, [redacted] is an issue of responsibility, not responsiveness, that should have been referred to the SBA. It was contrary to law and regulation for the Agency to find DYONYX's proposal [redacted] and to fail to submit any concerns over responsibility to the SBA.

**B.** [redacted]

The Solicitation [redacted] Although DYONYX's initial proposal did indicate that it [redacted] following discussions with the Agency, [redacted] In addition, it advised the Agency that, [redacted]

Because DYONYX's revised proposal [redacted] it was *responsive* to the Solicitation. The Agency [redacted] AR 2570. However, neither the Solicitation nor the Amendments [redacted] any concerns over whether DYONYX would be capable of performing as it had promised, [redacted] raise an issue of *responsibility*, not responsiveness. It was therefore contrary to law and regulation for the Agency to find that [redacted] with the solicitation, because concerns about [redacted] but one of responsibility that should have been referred to the SBA.

### C. The Agency's Failure to Refer the Responsibility Issue to the SBA Prior to [redacted] is Contrary to Law and Regulation.

The Agency [redacted] based upon its [redacted] As discussed above, DYONYX's proposal was responsive to both of these requirements; [redacted] Any concerns that DYONYX would not meet these promises were issues of responsibility, not responsiveness. The Agency's decision to

REDACTED VERSION

[redacted] based upon a responsibility determination is contrary to law and regulation, as was its failure to refer any such determination to the SBA. *Aeroplate Corp. v. United States*, 67 Fed. Cl. 4, 7 (Fed. Cl. 2005) (citing *Stapp Towing Inc. v. United States*, 34 Fed. Cl. 300, 302 (1995)); *Capitol CREAG LLC*, B-294958.4, January 31, 2005.

## II. It Was Arbitrary and Capricious for the Agency to Base Its [redacted] on Inaccurate Information.

A contracting agency must provide "'a coherent and reasonable explanation of its exercise of discretion.'" *Impresa Construzioni,* 238 F.3d at 1332 (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C.Cir.1994)). Failure to do so is an abuse of discretion. Because the [redacted] was based on inaccurate information, or otherwise unsupported by the record, the Agency cannot provide a coherent and reasonable explanation for [redacted]

### A. Awarding [redacted] is Arbitrary and Capricious Because it is Unsupported by the Record.

Three individuals from the Agency conducted TEP Technical Evaluations of the Revised Proposals. [redacted] While the Agency is given broad discretion in making its evaluation ratings, [redacted]

The Agency also awarded [redacted] Had the Agency [redacted]

Because [redacted] is unsupported by the Agency's own findings, as stated in the record, the Agency cannot provide a coherent and reasonable explanation for [redacted] Although on its own this may not be a significant enough error to support a finding that the exclusion of DYONYX from the competitive range was arbitrary and capricious, such a finding is warranted when this error is considered in conjunction with the many other errors [redacted] and the fact that the Source Selection Authority did not exercise independent judgment in making his determination.

**B. The Agency's Finding [redacted] is Arbitrary and Capricious Because it is Unsupported by the Record.**

In the [redacted], the Agency stated that [redacted]

[redacted] AR 2566. In fact [redacted]

The [redacted] also stated that [redacted] *Id.* As with the [redacted] the Agency again made an error in reviewing DYONYX's proposal. [redacted]

Based upon its erroneous belief that [redacted] the Agency concluded that [redacted] *Id.* The Agency also concluded that [redacted] The Agency's decision to assign [redacted] is arbitrary and capricious because it was based upon inaccurate information, and the Agency cannot provide a coherent and reasonable explanation for reaching such a decision.

### C. The Agency's Determination that [redacted] was Arbitrary and Capricious.

The Agency also found that DYONYX's proposal [redacted] As discussed in greater detail above, DYONYX's proposal stated [redacted]

[redacted]

Any concerns whether DYONYX would be able to meet this promise are issues of responsibility that should have been referred to the SBA. Because the Agency did not refer the responsibility concerns to the SBA, it had no coherent or reasonable explanation for determining that DYONYX was unable [redacted] as promised.

Without a decision from the SBA, it was arbitrary and capricious for the Agency to [redacted]

**D. The Agency's Determination that [redacted] was Arbitrary and Capricious.**

As with the [redacted], the Agency's determination that DYONYX's [redacted] As already discussed, DYONYX's revised proposal stated that [redacted] Thus, the proposal was compliant with the [redacted] and was responsive/technically acceptable. Any concerns as to whether DYONYX would be able to meet its promise [redacted] are issues of responsibility that should have been referred to the SBA. Because the Agency did not

refer the responsibility concerns to the SBA, it had no coherent or reasonable explanation for determining that [redacted]

Additionally, the Agency's decision not to include DYONYX [redacted] suggests that it did not treat all offerors equally, as required to do. As of the proposal due date, [redacted] AR 2507. For some unknown reason [redacted] stated that [redacted] AR 2507. The discrepancy between how the Agency treated DYONYX's and CSC's [redacted] was arbitrary and capricious.

**E. Rating [redacted] is Arbitrary and Capricious Because it is Unsupported by the Record.**

As with the preceding arguments, the Agency's ranking [redacted] However, although the Executive Summary states that the [redacted] AR 256, the Executive Summary description [redacted] This ranking is not only inconsistent with

the text [redacted] but is also inconsistent with the chart on the same page [redacted]

Agencies obviously are entitled to broad discretion in ranking proposals. It is somewhat inconsistent, however, [redacted] AR 178. [redacted] on the first page of the document, repeated on the fourth page, [redacted] unsupported by the record and is therefore arbitrary and capricious.

**F. Rating [redacted] is Arbitrary and Capricious Because it is Unsupported by the Record.**

The revised proposal of [redacted] in the competitive range determination. That conclusion is unsupported by the record. [redacted] AR 2489.

The consensus evaluation labeled this [redacted]

[redacted]

The Agency's treatment [redacted] demonstrates that the evaluators gave CSC and DYONYX unequal treatment. With respect to DYONYX's proposal, [redacted] However, even though CSC's proposal [redacted]

Furthermore, and more telling on the issue of unequal treatment, [redacted]

> [redacted]

AR 2565. This is in stark contrast to the Agency's finding [redacted]

**III. The Source Selection Authority's Failure to Make an Independent Judgment is Contrary to Law and Regulation.**

FAR 15.308 requires the Source Selection Authority ("SSA") to make an independent judgment on decisions in the solicitation process:

> While the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment. The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs.

This Court and the GAO require SSA compliance with this regulation. "The United States Court of Federal Claims has reiterated the FAR's requirement of independent judgment: A contracting officer should exercise her discretion *independently* and in an informed manner." *Info. Scis. Corp. v. United States,* 73 Fed. Cl. 70, 120 (Fed. Cl. 2006) (citations and internal quotations omitted) (emphasis in original). "Although the FAR contemplates that decisional authority may be supported by other procurement officials, nevertheless, FAR 15.308 requires evidence of the exercise of independent judgment. Therefore, the SSA simply can agree with the reasoning of the [decisional documents], but only if the SSA provides an independent rationale for that agreement." *Id.* at 121.

The SSA failed to comply with FAR 15.308 in this case. The Administrative Record is lacks any evidence that the SSA exercised any independent judgment; rather it is apparent that he merely placed his signature on the "Approved" line of each of the decisional documents. There is nothing to indicate that the SSA even considered the contents of the memos he received. This is especially troubling given the numerous factual errors that were made [redacted]

[redacted] as well as the Agency's decision [redacted] based upon responsibility determinations without referring such issues to the SBA. These errors made by the procurement officials were only compounded by the SSA's failure to render an independent judgment on the source selection decision.

## CONCLUSION

For the reasons set forth above, Plaintiff DYONYX respectfully requests that the Court enter Judgment on the Administrative Record in favor of DYONYX.

Respectfully submitted,

/s/ Terrence M. O'Connor

Terrence M. O'Connor
Stephanie D. Wilson
ALBO & OBLON, L.L.P.
2200 Clarendon Boulevard, Suite 1201
Arlington, Virginia 22201
Telephone (703) 562-3382
Facsimile: (703) 312-0415
*Counsel for DYONYX, L.P.*

Dated: July 31, 2008
(electronically filed)

**CERTIFICATE OF FILING**

I hereby certify that on this 31st day of July, 2008, a copy of the foregoing "Plaintiff DYNOYX, L.P.'s Motion for Judgment on the Administrative Record" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

___/s/ Terrence M. O'Connor____