# In the United States Court of Federal Claims

No. 08-458C
(Filed September 15, 2008) 1/

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * | * | |
| | * | |
| **DYONYX, L.P.,** | * | Pre-award protest; 28 U.S.C. |
| | * | § 1491(b)(1) (2000); judgment |
| Plaintiff, | * | on the administrative record; |
| | * | jurisdiction; standing; whether |
| v. | * | standing to protest depends on |
| | * | submission of compliant final |
| **THE UNITED STATES,** | * | proposal; merits of procurement |
| | * | decision; reasonableness of |
| Defendant. | * | agency action; injunctive relief. |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * | * | |

Terrence M. O'Connor, Arlington, VA, for plaintiff. Stephanie D. Wilson, Albo & Oblon, L.L.P., of counsel.

L. Misha Preheim, Washington, DC, with whom was Assistant Attorney General Gregory G. Katsas, for defendant.

## OPINION

**MILLER,** Judge.

This bid protest is before the court after argument on cross-motions for judgment on the administrative record. The Government originally made the senseless jurisdictional argument that an agency arbitrarily can declare a protested proposal to be nonconforming, while accepting the awardee's allegedly nonconforming proposal, and thereby preclude the protestor from standing to challenge the award. During argument defendant agreed that a protestor can challenge an agency determination that its proposal was noncompliant and that the awardee's was compliant.

---

1/ This opinion originally was filed under seal on August 29, 2008. By ¶ 2 the parties were requested to notify the court of any redactions. All redactions requested are denoted by brackets.

## FACTS

The Administrative Record (the "AR") is the source for the following facts. The Millennium Challenge Corporation (the "MCC") is a United States Government corporation established in January 2004. The MCC's mission is to reduce global poverty by promoting sustainable economic growth in the world's poorest countries. The MCC focuses its efforts on providing aid to poor countries that promote good governance, economic freedom, and investments for their people. The MCC relies on high-quality information and technology systems to support its efforts worldwide.

On November 21, 2007, the MCC issued a Solicitation and Offer, Negotiated Acquisition under RFP (Request for Proposals) No. MCC-08-0020-RFP-45 (the "Solicitation" or "RFP"), calling for Information Technology ("IT") services to support all of the MCC's programs and operations. The Solicitation contemplated an "award of a single GSA [General Services Administration] Task Order, with options, reflecting contract line items that are Firm Fixed Priced, and IDIQ [Indefinite Delivery, Indefinite Quantity] contract line items that are on a Firm Fixed Priced and Time and Materials (T&M) Task/Delivery order basis." AR Tab 8 at 163.

The MCC had issued a Request for Information inviting vendors under the GSA Federal Supply Schedule ("FSS") 70, SIN 132 51 to submit offers. A small business under the Small Business Act, 15 U.S.C. §§ 631-651 (2000), Dyonyx, L.P. ("plaintiff"), was the incumbent contractor for technology services for the MCC and one of nine vendors selected to compete for the contract.

The Solicitation called for a best value or trade-off valuation based on price and non-price evaluation factors: Technical Capability, Past Performance, and Business/Price. The awardee would be a single offeror whose proposal offered the best value based on a trade-off valuation between the price and the non-price factors.

The RFP directed offerors to prepare their proposals in accordance with specifications in the RFP that listed the substantive elements and organization required for a complete proposal. See AR Tab 8 at 164, 166-67. The title and content of a proposal was to be organized in three separate volumes, with each volume representing each evaluation factor. The RFP directed an offeror not simply to restate the MCC's requirements, but to provide a convincing rationale to address how the offeror planned to meet the requirements of the Performance Work Statement (the "PWS") and the performance objectives.

The best value determination was based on an evaluation of each of these volumes in accordance with the criteria set forth in section M of the RFP. The best-value approach

anticipated that a combination of non-price factors could be significantly more valuable than price. "The best value tradeoff process described in FAR 8.404(d) and FAR 15.215-1 (incorporated by reference) permits tradeoffs among price and non-price factors and allows the Government to accept other than the lowest priced proposal or the highest technically rated proposal." AR Tab 8 at 176. The award would "be made to that responsive, responsible Offeror whose total aggregate offer is in the best interest of the Government." Id. The evaluation formula weighted each factor differently; technical capability was of higher value than past performance; and the combination of technical capability and past performance was valued higher than price.

Plaintiff's complaint principally implicates two provisions of the RFP. First, the requirement that the personnel must be certified "upon assignment to the contract" is understood by plaintiff to mean that the key personnel must be certified by the contract start date, not by the date of final proposal submission. Compl. ¶ 39 (quoting AR Tab 8 at 196). Second, the Solicitation, as amended, explicitly disallowed pricing to reflect open-market items, AR Tab 10 at 292, 424, but allowed an offeror to team with another GSA FSS vendor to avoid purchase of open-market items. See AR Tab 10 at 292, 424. Plaintiff takes the position that its final proposal was compliant because plaintiff stated that it was "entering into an agreement with another GSA FSS contractor so that there would be no 'open market' items" as of the contract start date. Compl. ¶¶ 47-49.

The MCC intended to award the contract without discussions. See AR Tab 8 at 179. However, in accordance with Federal Acquisition Regulation, Part 15.306(a)(1), (2) (codified as 48 C.F.R. (FAR) § 15.306(a)(1), (2) (2007)), if no discussions were held, an offeror would be given the opportunity to clarify any adverse past performance findings with respect to those matters that the offeror previously had not been given the opportunity to clarify or respond. The MCC reserved the right to make a competitive range determination and, if necessary, to open discussions only with a limited number of offerors.

To determine the competitive range, the Solicitation rated each proposal on its technical capability by assigning an adjectival rating for each specified subfactor, listed in descending order of importance. For the technical subfactors (Technical Capability and Soundness of Approach, Performance Management, Performance Improvement AF Plan, and Staffing), the Solicitation adopted the following adjectival ratings:

> Outstanding ("O") Proposal very significantly exceeds the most important factors in a way that is beneficial to the agency. Risk is very low, and the proposal indicates a very high probability of successful performance. There are no deficiencies in major subject areas of the PWS/RFP.

Good ("G") Proposal meets or exceeds the most important factors in a way that is beneficial to the agency. Risk is low, and the proposal indicates a high probability of successful performance. There are no deficiencies in major subject areas of the PWS/RFP.

Acceptable ("A") Proposal meets all significant standards. Risk is low, and there is a good probability of success. There are no critical deficiencies; any deficiencies present can be readily corrected (and must be prior to award).

Marginal ("M") Some important standards have not been met. Risk is evident, and there is a low probability of success. There are serious deficiencies in the proposal, but they are correctable (and must be corrected prior to award).

Unacceptable ("U") Several important standards have not been met. Risk is high, and there is little likelihood of success. The proposal would have to be completely rewritten to make it acceptable.

AR Tab 8 at 176-78.

In rating the second factor, Past Performance, the Solicitation assigned a "Performance Risk Assessment" value using the following adjectival ratings:

| **Rating** | **Definition** |
|---|---|
| Low Risk | Based on the Offeror's performance record, essentially no doubts exist that the Offeror will successfully perform the required effort. |
| Moderate Risk | Based on the Offeror's performance record, some doubt exists that the Offeror will successfully perform the required effort. |
| Unknown Risk | No relevant performance record is identifiable upon which to base a meaningful performance risk prediction. A search was unable to identify any relevant past performance information for the Offeror or key team members/subcontractors or their key personnel. This is neither a negative or positive assessment. |
| High Risk | Based on the Offeror's performance record, significant doubt exists that the Offeror will successfully perform the required effort. |

AR Tab 8 at 178. The Past Performance factor was intended to reflect the MCC's confidence in the vendor to perform as proposed. In assessing risk level, a number of factors were considered, such as demonstrated record of contract compliance, recent and relevant performance records that focused on performance relevant to Technical Capability, and Cost Factors. The Solicitation considered customer references, government records, and information from other sources in evaluating these factors. See id.

The RFP stipulated that in rating the third factor, Business/Price, price would be evaluated for "realism and reasonableness for the proposed effort." AR Tab 8 at 179. The price evaluation would include an analysis based on the following requirements: Base Period Contract Line Item Number ("CLIN") for Firm Requirements, Base Period IDIQ CLIN, Option CLIN for both Firm Core Requirements and IDIQ CLIN, Profit Strategy for the Fixed Priced and Award Fee (all CLIN). See id. An unrealistically low price proposal could be grounds for eliminating the proposal from the competition based on the MCC's finding that an offeror either did not understand the requirements or submitted an unrealistic proposal. See id.

The MCC issued four amendments to the RFP. The first amendment, dated November 28, 2007, changed the close date for the past performance information to the same date as the close date for final proposals and also extended the entire close date to December 20, 2007. See AR Tab 9 at 276. On December 4, 2007, the MCC issued the second amendment, which answered questions submitted by offerors and extended the close date for past performance evaluation forms to January 11, 2008. See AR Tab 10 at 278. A vendor had asked whether the MCC will "consider accepting key personnel who are in the process of obtaining the requisite certifications listed in the PWS Attachment J.1[]." AR Tab 10 at 300. The answer provided in the amendment stated that "[n]o, [k]ey personnel shall have the requisite certifications at contract award and this should be reflected in their proposed resumes." Id.

On December 13, 2007, the third amendment increased the NTE (not to exceed) ceiling amount for the IDIP line items and provided a Contractor Performance Report evaluation form to submit references for past performance. See AR Tab 11 at 412-22. The fourth amendment dated February 14, 2008, notified all offerors which vendors were included in the initial competitive range, clarified the organizational and substantive structure requirements for final proposals, and set a final proposal due date of February 21, 2008. See AR Tab 12 at 423. The amendment also stated that "[n]o 'open market' items may be proposed on this effort per GSA guidelines. Offerors should team with other GSA vendors to provide items not listed on their own schedule." AR Tab 12 at 424.

On December 19, 2007, the MCC issued the "Source Selection and Technical Evaluation Plan for IT Services" that set forth the process by which the MCC would select a contract awardee: (1) the proposals are submitted by each vendor competing for the contract; (2) the Technical Evaluation Panel (the "TEP"), the Past Performance Evaluation Panel (the "PPEP"), and other technical and non-technical advisers evaluate the individual proposal and then prepare an evaluation report; (3) the TEP, PPEP, and advisers discuss their individual determinations; (4) the teams consolidate the findings and make a competitive range recommendation to the contracting officer; (5) the contracting officer prepares the source selection recommendation and submits it to the Source Selection Authority (the "SSA"); and (6) the SSA either accepts the recommendation or directs the teams to conduct a more in-depth analysis. See AR Tab 4 at 69.

Plaintiff timely submitted its initial proposal on December 20, 2007. See AR Tab 13 - 15. The MCC received proposals from five of the nine vendors, including plaintiff. On February 1, 2008, the SSA issued the initial Competitive Range Determination finding that only three vendors – plaintiff, Computer Sciences Corporation ("CSC"), and Advanced Technology Systems ("ATS") – qualified for inclusion in the initial competitive range. See AR Tab 26 at 1912. The SSA also determined that, because none of the proposals fully complied with the conditions and terms of the RFP, discussions must be conducted with each vendor before a contract would be awarded. See AR Tab 26 at 1911. In this initial review, the TEP gave both plaintiff and CSC an overall technical rating of [ ]. AR Tab 26 at 1909. The SSA assigned plaintiff a [ ] rating for past performance and noted that plaintiff submitted [ ]. AR Tab 26 at 1910. CSC received a [ ] rating for past performance and submitted the [ ]. AR Tab 26 at 1910.

On February 7, 2008, the contracting officer sent plaintiff a number of documents that summarized the weaknesses and deficiencies in plaintiff's original proposal and the clarifications and changes required for the final proposal. See AR Tab 31 at 1932-48. Thereafter, on February 12, 2008, members from the TEP, the PPEP, and two contracting officers held discussions with plaintiff to review and clarify their concerns with plaintiff's proposal. See AR Tab 32 at 1949. Plaintiff submitted its Final Proposal Revisions on February 21, 2008. See AR Tab 34 - 36.

On March 6, 2008, the PPEP forwarded to the contracting officer a Summary of Final Past Performance Review. In its review the PPEP stated that

[

].

AR Tab 45 at 2491. [

] AR Tab 45 at 2491. On March 17, 2008, the TEP also submitted its Overall Rating Sheet and Final Consensus to the contracting officer. See AR Tab 44 at 2478.

On March 20, 2008, the SSA issued the final Competitive Range Determination (the "final range determination") stating that only one offeror, CSC, remained in the competitive range. AR Tab 47 at 2564. The final range determination reflected that [

].

In summarizing the review of the final proposals, the SSA's final range determination found that plaintiff was [

]. AR Tab 47 at 2570. The determination memorandum stated that the "MCC addressed 'open market' products and services in its written notice of weaknesses, deficiencies, and clarification items sent to," id., plaintiff on February 7, 2008, see AR Tab 31 at 1938. The memorandum reflects that the evaluation teams discussed this issue with plaintiff on February 12, 2008. AR Tab 47 at 257. The final range determination also noted that the prohibition of open-market items was reiterated to plaintiff in the fourth amendment issued on February 14, 2008. See AR Tab 47 at 2570.

On May 20, 2008, the contracting officer issued a Post-award Notification for Unsuccessful Offeror informing plaintiff that CSC would be the awardee. Plaintiff requested by e-mail that date that the contracting officer debrief plaintiff with respect to its decision. On May 22, 2008, the contracting officer sent plaintiff the technical evaluations prepared by the TEP and then conducted a telephone debriefing on the following day. On May 23, 2008, the contracting officer prepared a memorandum that summarized the points discussed with plaintiff during the telephone debriefing. See AR Tab 61 at 3138-39.

On June 20, 2008, plaintiff filed its complaint in the United States Court of Federal Claims protesting its exclusion from the competitive range and alleged five counts upon which relief should be granted. In its first count, the complaint alleges that the MCC violated federal law and regulations by not complying with the terms of the Solicitation when evaluating the key personnel factor of plaintiff's proposal. Compl. ¶¶ 36-41. The second count charges that the MCC violated federal law and regulations by not complying with the evaluation process in the Solicitation regarding plaintiff's use of open-market items. Id. ¶¶ 42-49.

The third count of the complaint alleges that the MCC failed to conduct meaningful discussions with plaintiff because the MCC did not make clear that it would eliminate plaintiff from the competitive range if plaintiff both did not conform to the prohibition against open-market items and certify its personnel before the final proposal date. Id. ¶¶ 50-55. The fourth count asserts that the MCC's evaluation of plaintiff's Past Performance determination was arbitrary and capricious. Id. ¶ 60. Plaintiff alleges that the final, overall adjectival rating assigned to plaintiff of [ ] did not reflect the individual evaluations submitted in support of this factor and that the MCC failed to provide a reasonable and coherent explanation for this finding. Id. ¶¶ 56-60. The fifth and final count alleges that the MCC violated the Small Business Act, 15 U.S.C. § 637(b)(7)(A); FAR Part 19 (codified as 48 C.F.R. § 19.000 (2007)), for failing to refer the issue of plaintiff's responsibility to the Small Business Administration (the "SBA") after excluding plaintiff from the competitive range. Id. ¶¶ 61-68.

Pursuant to a scheduling order entered on June 25, 2008, plaintiff and defendant on July 31, 2008, submitted simultaneous cross-motions for judgment on the administrative record, with defendant also moving to dismiss the complaint on jurisdictional grounds. On August 8, 2008, plaintiff and defendant submitted simultaneous responsive briefs. Oral argument was held on August 19, 2008.

## DISCUSSION

### I. Jurisdiction

The United States Court of Federal Claims derives jurisdiction over government bid protests from the Tucker Act. 28 U.S.C. § 1491(b)(1) (2000), amended by the Administrative Disputes Resolution Act of 1996, Pub. L. No. 104-320, § 12(a), 110 Stat. 3870, 3874-75 (codified at 28 U.S.C. § 1491(b)) (the "ADRA"). Specifically, the Court of Federal Claims has jurisdiction over actions by an "interested party" objecting to: (1) a solicitation by a federal agency for bids or proposals for a proposed contract; (2) a proposed award or the award of a contract; or (3) any alleged violation of a statute or regulation in connection with a procurement or a proposed procurement. 28 U.S.C. § 1491(b)(1). The court may "award any relief that the court considers proper, including declaratory and injunctive relief." 28 U.S.C. § 1491(b)(2).

### II. Standing

Every plaintiff must have standing to invoke the court's jurisdiction over a bid protest. Sicom Sys., Ltd. v. Agilent Tech., Inc., 427 F.3d 971, 975 (Fed. Cir. 2005). 28 U.S.C. § 1491(b)(1), provides, in pertinent part: "[T]he United States Court of Federal Claims . . . shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a federal agency for bids or proposals . . . ." The pivotal element of standing in a bid protest is whether a protester qualifies as an "interested party" under section 1491(b)(1). See Am. Fed'n of Gov't Emp. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) ("AFGE") (holding that "interested party" under the Tucker Act is construed in accordance with Competition in Contracting Act, 31 U.S.C. § 3551(2) (2000)).

The United States Court of Appeals for the Federal Circuit defines "interested party" in section 1491(b)(1) as "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract [by the government]." Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (internal quotation marks and emphasis omitted). This statutory definition places a two-part burden on a plaintiff to establish standing: (1) plaintiff must show that it is an actual or prospective bidder, and (2) plaintiff must show that it possesses a direct economic interest. Rex, 448 F.3d at 1307 (citing Myers Investigation & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) ("The party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing]."))).

## III. Standards

### 1. Standard of review of a bid protest concerning a negotiated procurement

To obtain permanent injunctive relief, a protester must prove either that the agency acted arbitrarily or capriciously or that it prejudicially violated an applicable procurement regulation. Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) ("Domenico Garufi") (discussing cases based on Scanwell Labs. Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970)).

The ADRA's standard of review for agency procurement decisions mirrors the standard of review set forth in the Administrative Procedure Act, 5 U.S.C. § 706 (2000) (the "APA"). See 28 U.S.C. § 1491(b)(4) (2000); Banknote Corp. of America v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004). The APA gives the court discretion to set aside only an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see PGBA LLC v. United States, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004) (clarifying that ADRA incorporates arbitrary and capricious standard of APA to review procurement decisions, but did not change court's discretion in granting remedy of injunctive relief); see also Domenico Garufi, 238 F.3d at 1332-33. However, establishing that an agency violated the APA standard of review does not entitle a protestor to relief; the error must also be prejudicial. 2/ Galen Med. Assoc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (clarifying that, in addition to significant error in procurement process, plaintiff must show that error was prejudicial (citing Data Gen.

---

2/ The Federal Circuit has held that "the question of prejudice goes directly to the question of standing . . . [and that] 'prejudice is a necessary element of standing.'" Info. Tech. & App. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (quoting Myers, 275 F.3d at 1370). Although the prejudice requirement for standing has been satisfied by a nominal showing that a protester "could compete for the contract," Myers, 275 F.3d at 1370, the prejudice requirement required for success on the merits consistently has been more stringent. See Galen Med. Assoc. v. United States, 369 F.3d 1324, 1330-31 (Fed. Cir. 2004) (denying existence of prejudice when proposal did not have requisite facilities required by solicitation); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1563 (Fed. Cir. 1996) (prejudice not found when, despite pricing error, protestor's prices remained substantially higher). In essence, these are incongruent, although slightly overlapping, standards. See generally Textron, Inc. v. United States, 74 Fed. Cl. 277, 284-85 & n.3, 329-30 (2006) (summarizing Federal Circuit caselaw); cf. Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (holding that both standards can be satisfied with same demonstration of "substantial chance" of receiving the award but for alleged error).

Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996)). Accordingly, the Federal Circuit applies a two-step analysis for bid protests: first, the court must determine whether the Government acted without a rational basis (whether the action was arbitrary or capricious), see Domenico Garufi, 238 F.3d at 1332; or whether the Government acted contrary to law (whether the Government action constituted a prejudicial violation of an applicable procurement regulation). In either case a plaintiff bears the heavy burden of proving a lack of rational basis or a violation of the law. See id. at 1333. Second, if the government action lacked a rational basis, a factual inquiry must be conducted to determine whether the protester was prejudiced by the conduct. See Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005).

Agency action is arbitrary or capricious when it does not have a rational basis for its decision. A rational basis requires "the contracting agency [to] provide[] a coherent and reasonable explanation of its exercise of discretion." Domenico Garufi, 238 F.3d at 1333 (internal quotation marks omitted). The court's role in a bid protest, including ascertaining the existence of a rational basis, is not to substitute judgment for the agency; indeed, the agency generally is accorded wide discretion in evaluating bids, and the court should not substitute its judgment for that of the agency. Grumman Data Sys. Corp. v. Widnall, 15 F.3d 1044, 1046 (Fed. Cir. 1994); see also Camp v. Pitts, 411 U.S. 138, 142-43 (1973) (stating that courts should review facts to determine if agency's decision is supported by rational basis).

When the procurement at issue is a negotiated "best value" procurement, as in the case at bar, "the protestor's burden of proving [the APA test] is greater than in other types of bid protests." Galen, 369 F.3d at 1330. Because a best-value procurement involves balancing both price factors, a objective measure, and nonprice factors, a more subjective measure, "the contracting officer [has] even greater discretion than if the contract were to have been awarded on the basis of cost alone." Id.

Agency procurement procedures must conform to applicable laws and regulations to meet the APA standard. 5 U.S.C. § 706(2)(A); Bannum, 404 F.3d at 1351; Domenico Garufi, 238 F.3d at 1335. Federal law dictates that an agency must "evaluate . . . competitive proposals and make an award based solely on the factors specified in the solicitation." 10 U.S.C. § 2305(b)(1) (2000). An agency has no discretion regarding which regulation or requirement of a given solicitation is more or less important; the mandatory requirements or procedures in an RFP are strictly binding, "'regardless of [the agency's] view of the appropriateness of the standard.'" Alfa Laval,175 F.3d at 1367-68 (quoting Alfa Laval Separation, Inc. v. United States, 40 Fed. Cl. 215, 230 (1998), rev'd on other grounds, 175 F.3d 1365 (Fed. Cir. 1999)).

2. Standard of review for judgment on the administrative record

The parties filed cross-motions for judgment on the administrative record pursuant to RCFC 52.1(b). This rule provides a procedure allowing the court to expedite a trial by using a "paper record" to conduct fact finding. Bannum, 404 F.3d at 1356. Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record. Id. The parties are restricted to the agency record and any supplementation consistent with RCFC 52.1. Findings of fact made by the court are consistent with those that would be made during trial. Id. at 1357.

3. Standards for obtaining injunctive relief

While the Court of Federal Claims has power to grant injunctive relief in a bid protest action, 28 U.S.C. § 1491(b)(2), the award of injunctive relief is "extraordinary" and should be granted only in limited circumstances. United States v. John C. Grimberg Co., Inc., 702 F.2d 1362, 1372 (Fed. Cir. 1983). A plaintiff must succeed on the merits, make a showing that it will suffer irreparable harm if injunctive relief is not granted, show that the harm at risk outweighs the harm to the Government if the injunction is not granted, and prove that the desired injunction is not contrary to public policy. PGBA, LLC, 389 F.3d at 1228-29; FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993). No single factor in the test is necessarily dispositive, FMC, 3 F.3d at 427, and "the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned to other factors, to justify the denial [of an injunction]." Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc., 908 F.2d 951, 953 (Fed. Cir. 1990).

VI. Sufficiency of plaintiff's proposal

1. Standing as a function of relative responsiveness

Plaintiff argues that it has standing to pursue this action (1) because it was an actual offeror in this Solicitation and (2) because its direct economic interest would be affected adversely by the award to CSC, the successful bidder. Plaintiff contends that the MCC arbitrarily excluded plaintiff's proposal from the competitive range because plaintiff's final proposal still contained open-market items (plaintiff argues that this nonconformity was illusory), whereas CSC's final proposal manifested the same type of noncompliance for a similar requirement.

Defendant had argued in its two briefs that the MCC's exclusion of plaintiff's final proposal as noncompliant defeats its claim to standing. See Def.'s Br. filed Aug. 8, 2008, at 1; Def.'s Br. filed July 31, 2008, at 19. During oral argument, however, defendant

conceded that plaintiff has standing to challenge the MCC's determinations that plaintiff's proposal was noncompliant and that CSC's proposal was compliant. See Transcript of Proceedings, at 36, Dyonyx, L.P. v. United States, No. 08-458C (Fed. Cl. Aug. 19, 2008) ("Tr."). ("Our view is that Dyonyx has standing to address two issues here. First, whether or not their proposal was in fact compliant, which goes to the open-market issue, and, secondly, whether or not CSC's proposal was in fact compliant.") Defendant nonetheless would limit the court's consideration to these issues.

Although jurisdiction cannot be established by a litigant's concession, see Industrial Addition Ass'n v. Comm'r, 323 U.S. 310, 313 (1945) (stating that parties cannot confer jurisdiction by mutual consent), accord Grantham v. Brown, 114 F.3d 1156, 1158 (Fed. Cir. 1997); Gould v. Control Laser Corp., 866 F.2d 1391, 1393 (Fed. Cir. 1989); Glasstech, Inc. v. AB Kyro OY, 769 F.2d 1574, 1577 (Fed. Cir. 1985), defendant, in effect, acknowledged that using the acceptability of a proposal to determine standing could produce an inane result. Thus, defendant would be arguing that, even if CSC's proposal was materially noncompliant, plaintiff lacked standing to question the award because plaintiff's proposal was materially noncompliant. Ultimately, defendant argued that plaintiff's final proposal failed a mandatory requirement that pertained to compliance, whereas CSC's proposal manifested a weakness in staffing, a non-mandatory technical subfactor that the MCC considered in weighing the minimum qualifications of the staff proposed by both plaintiff and CSC. This argument is not an issue of standing.

The caselaw has confused the legal issue whether a noncompliant proposal forfeits the offeror's status as an actual offeror. This confusion arises within the Court of Federal Claims and not in the binding precedent of the Federal Circuit. The confusion traces to the Federal Acquisition Regulation, which attaches the concept of responsiveness to eligibility "[t]o be considered for award."

> PART 14 – SEALED BIDDING
> SUBPART 14.3 – SUBMISSION OF BIDS
>
> 14.301 Responsiveness of bids.
>
> (a) To be considered for award, a bid must comply in all material respects with the invitation for bids [IFB]. Such compliance enables bidders to stand on an equal footing and maintain the integrity of the sealed bidding system.

The FAR confines the concept of responsiveness to sealed bidding. FAR Part 15 Contracting by Negotiation, governing competitive procurements, neither employs the term

nor the concept of "responsiveness." This distinction is significant. As the Federal Circuit held in AFGE, 258 F.3d at 1302, "the term 'interested party' in [28 U.S.C.] § 1491(b)(1), . . . [as related to standing] is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract."

Subsequently, the Court of Federal Claims in A&D Fire Protection, Inc. v. United States, 72 Fed. Cl. 126, 139 (2006), involving a negotiated procurement (an RFP) held that, by failing to prove that it submitted a bid bond, the offeror has failed to show that it was a "qualified bidder" and therefore lacked standing. The court also held that the solicitation's prohibition of submission of a bid bond via facsimile transmission rendered the proposal nonresponsive. See id. at 138-40. The court in Dismas Charities, Inc. v. United States, 75 Fed. Cl. 59 (2007), another negotiated procurement, cited and quoted A&D for the proposition that a bidder submitting a nonresponsive bid lacks standing and continued:

> Although responsiveness is generally used to describe sealed bids, the same concept applies to final offers submitted after negotiations. Just as a sealed bid that does not meet the minimum solicitation requirements is non-responsive and cannot be considered for contract award, FAR § 14.301(a), a Final Proposal Revision that does not conform to the solicitation requirements is technically unacceptable and cannot be considered for award unless the agency reopens negotiations for all offerors or modifies the solicitation. *See* FAR § 15.307(b); *cf. Labat-Anderson, Inc. v. United States*, 42 Fed. Cl. 806, 841 (1999) (contrasting technically unacceptable initial proposals with technically unacceptable Best and Final Offers).

Dismas Charities, 75 Fed. Cl. at 61.

FAR § 15.307(b) addresses proposal revisions in negotiated procurements. Although Labat-Anderson states that generally a technically unacceptable proposal must be excluded from the competitive range, neither FAR § 15.307(b) nor Labat-Anderson purports to address standing as a function of technical acceptability. Nor does Burroughs Corp. v. United States, 617 F.2d 590 (Ct. Cl. 1980), 3/ cited by Labat-Anderson for the proposition that a technically

---

3/ The United States Court of Claims in Burroughs underscored the difference between sealed bids and negotiated procurements:

> In formally advertised bidding the pertinent statutes and regulations are far more strict about the conduct of the procurement than in a negotiated one,

unacceptable proposal cannot be considered for award. Id. at 596 (cited in Labat-Anderson, 42 Fed. Cl. at 841).

Defendant's opening brief seized on Dismas as authority for its argument that plaintiff's proposal was "non-responsive" and "non-compliant" and thereby forfeited plaintiff any standing to protest. Def.'s Br. filed July 31, 2008, at 19. However, Dismas cited a regulation and case, FAR § 15.307(b) and Labet-Anderson, that apply to consideration of evaluation of negotiated proposals after discussions.

While defendant drew support from Dismas, it was also inspired by Eracent, Inc. v. United States, 79 Fed. Cl. 427 (2007), also cited in defendant's opening brief. This case involved a GSA FSS acquisition for which a non-FSS contractor had standing to challenge whether a FSS order included non-FSS items which, by regulation, were prohibited from inclusion in a task order. The court ruled on the merits. To the extent that the non-FSS contractor/protestor was challenging a potential violation of 31 U.S.C. § 3324 (2000) (dealing with advances of public money), the court alternatively ruled that plaintiff lacked standing. 79 Fed. Cl. at 433. Judgment, however, was entered on the merits.

Given that Dismas cannot stand for the broad proposition argued in defendant's opening brief, the court reiterates that it is the Federal Circuit, not the Court of Federal Claims, that issues the decisions defendant should cite as law. As Judge Bush pointed out in her recent decision Tip Top Construction Inc. v. United States, 2008 WL 3153607 (Fed. Cl. Aug. 1, 2008), Rex is the law of the Circuit. The Government's efforts to whittle away the jurisdiction of the Court of Federal Claims by circular arguments attacking standing, such as in Tip Top, 2008 WL 3153607 at *11 (characterizing as "circular" defendant's argument

---

3/ (Cont'd from page 14.)

> consequently in negotiated procurement the contracting officer is entrusted with a relatively high degree of discretion. For example, in formal advertising, a contracting officer is prohibited from considering a bid which does not conform to the invitation for bids. *See* 10 U.S.C. § 1205(c) (1976), Nash & Cibinic, Federal Procurement Law 345 (3rd ed. Vol. 1, 1977). Yet this concept is *not* applicable to negotiation, where the contracting officer is permitted to conduct oral or written discussions with offerors whose proposals vary from the RFP. 8/
>
> 8/ This process is often referred to as "curing."

617 F.2d at 598 & n.8.

that protestor could not show that it was responsible and therefore could not show that it had a substantial chance of winning award), or in the case at bar (arguing that offeror had no standing based on noncompliant sources of items proposed), are transparent and misleading attempts to change binding law. 4/

2. Compliance with prohibition on off-schedule items by proposer

Plaintiff argued that it was compliant with the open-market restriction because in its final proposal "show[ed] that [plaintiff] was entering into a teaming agreement with another GSA FSS contractor, [ ], as allowed by the Solicitation." Pl.'s Br. filed July 31, 2008 at 21. According to plaintiff, "it advised the [MCC] that, in an abundance of caution, it was adding items previously indicated [on its original proposal] as 'open market' to its existing GSA FSS schedule." Id. Plaintiff "expected this to be done before March 31, 2008." Id.

The Solicitation encouraged prospective contractors to team with other GSA schedule vendors to meet the no-open-market restriction. On December 4, 2007, the MCC issued Amendment 02, setting forth

> [p]er GSA guidelines, two or more GSA Schedule Contractors may work together, by complementing each other's capabilities, to offer a total solution to meet an ordering activity's requirement . . . . If the prime vendor does not partner with another GSA FSS schedule holder nor have the full requirements under SIN 132 51 or any of its own GSA FSS's under other SIN's, then is incumbent upon the contractor to ensure these additional services are added to their SIN 132 51 schedule with GSA. No open market items can be permitted. Please see GSA rules on Contractor Teaming Arrangements at www.gsa.gov.

AR Tab 10 at 292. The MCC reiterated in Amendment 04, issued on February 4, 2008: "No 'open market' items may be proposed on this effort per GSA guidelines. Offerors should team with other GSA vendors to provide items not listed on their own schedule." AR Tab 12 at 424.

---

4/ The Government did not attack the protestor's standing in Aeroplate Corp. v. United States, 67 Fed. Cl. 4 (2005), decided by the undersigned. Defendant cites Aeroplate as supporting its position. However, the case involved a sealed bid. The issue of responsiveness concerned the conformance of the protestor's bid bond to the requirements of the invitation for bids.

In response to the off-schedule restriction, plaintiff expressed in the third volume ("Business/Price") of its final proposal:

> For purposes of procuring the equipment under the scope of this contract, Dyonyx will partner with [ ] to procure the required equipment using the GSA Schedule of [ ]. As a major vendor of computer equipment and software to several federal government agencies, it is [ ] policy to not enter into a teaming arrangements for this type of engagement. Rather upon contract award, [ ] will request a 'Letter of Authorization' from the contracting officer or COTR to allow Dyonyx to procure equipment for purposes of this contact using [ ]-GSA Schedule.

AR Tab 36 at 2126. Plaintiff further clarified that it planned to enter into the same agreement with [ ] as it had with [ ], and that [ ] would also request a "Letter of Delegation" from the MCC for use of [ ]. See AR Tab 36 at 2127. Plaintiff included a table detailing the type of computer equipment and a description of the equipment, stated the quantity and the price, and identified the GSA vendor that it proposed for teaming to provide scheduled items to the MCC. See AR Tab 36 at 2126. The specified GSA vendor source was listed as either [ ] or [ ]. Id.

Following the submission of briefs, the parties agreed that teaming with other vendors to get items on schedule was not an issue. Tr. at 7. The parties primarily disagree about when plaintiff was required to comply with prohibition on using [ ]for open-market items – in its final proposal or by March 31, 2008, the operative date of contract award.

Plaintiff argues that the Solicitation, as amended, did not set a deadline by which a proposal had to reflect that no open-market pricing was offered, i.e., that the only items proposed were on the GSA schedule. Because its final proposal promised to eliminate all open-market items by the contract award date, plaintiff insists that the final proposal complied with the Solicitation. See Tr. 60-61. Defendant contends that the Solicitation, as amended, required that all proposed items had to be listed on the GSA schedule as of the date of final proposal, not the contract award date.

Plaintiff does not provide any authority directly on point to support its "promise theory," but argues that, if the MCC questioned whether plaintiff could provide the items as promised, the MCC should not have eliminated plaintiff, but referred the matter to the SBA for a nonresponsibility determination under FAR §§ 9.104-1 and 9.104-3. Pl.'s Br. filed Aug. 8, 2008, at 4; Tr. 5-6. Plaintiff admitted during argument that its promise theory is counterintuitive, see Tr. at 61-64, given the difficult situation that the MCC would face if

plaintiff were awarded the contract and then did not perform as promised. Nonetheless, plaintiff maintained that this is not an issue for the court to address; rather, it is one of contract administration. See Tr. at 61. 5/

It is not the trial court's province to "devise a procedure that fills in a gap that the FAR does not recognize as a critical interval." Aeroplate Corp. v. United States, 67 Fed. Cl. 4, 12 (2005). In absence of any regulation supporting plaintiff's theory that an offeror's promise to comply by the date of contract award with the terms of an RFP is sufficient to meet a substantive requirement of the RFP, the court must defer to the terms of the Solicitation, which prohibited the open-market items. The court therefore examines whether the MCC acted arbitrarily in disqualifying plaintiff and not accepting plaintiff's final proposal, including the promised conformance with the prohibition against open-market items.

In resolving the dispute of when plaintiff was required to comply with the open-market-items prohibition, the procurement history plays a role. Defendant admitted during oral argument that the original Solicitation did not make it clear that the prohibition had a deadline of final proposal date. See Tr. at 43. Amendment 02 dated December 4, 2007, stated that "[n]o open market items can be permitted," AR Tab 10 at 292, but did not indicate when open-market items had to be added to the GSA schedule. However, after plaintiff submitted its initial proposal on December 20, 2007, the MCC issued notice of the no-open-market-items prohibition on three separate occasions: (1) on February 4, 2008, the MCC issued its fourth amendment stating that "[n]o 'open market' items *may be proposed* on this effort per GSA guidelines. Offerors should team with other GSA vendors to provide items not listed on their own schedule." AR Tab 12 at 424 (emphasis added); (2) on February 7, 2008 the MCC provided plaintiff written notice of the weaknesses and deficiencies in plaintiff's proposal and specifically addressed the prohibition of open-market items, see AR Tab 31 at 1938; and (3) on February 12, 2008, the contracting officer and the evaluation teams (TEP and PPEP) again discussed this issue with plaintiff. See AR Tab 47 at 2570; Tab 32 at 1949. Therefore, when plaintiff submitted its final proposal stating that it "expected" to add all items to the GSA schedule by March 31, 2008, see AR Tab 34 at 1958, the MCC had a reasonable basis to find plaintiff's proposal noncompliant with the open-market restriction. See also AR Tab 47 at 2570 (stating that plaintiff's "proposal was not accepted nor executed as a GSA schedule modification as of the revised proposal due date").

---

5/ Plaintiff also commented that requiring full compliance before contract award suppresses competition. Because of the costs associated with contract bidding, many businesses would not be able to compete for contracts if full compliance were required before contract award. See Tr. at 58.

Given this ruling, plaintiff complains that the MCC's action to exclude plaintiff from the competitive range on this basis is arbitrary, because CSC's final proposal also failed to comply with another mandatory requirement.

3. CSC's compliance with requirements of the Solicitation

The Solicitation defined two classes of key personnel. The first class consisted of staff members that the contractor identified in its proposal as "essential to the work being performed under the proposed contract." AR Tab 8 at 196. The second class encompassed three specific positions that the Solicitation identified as key personnel – the Program Manager, the Senior On-Site Network Engineer and the Senior On-Site Help Desk Manager – each of which was required to hold listed mandatory certifications. See AR Tab 8 at 196-97. The mandatory certifications were as follows: Project Management Professional ("PMP") certification from the Project Management Institute and Certified Information Systems Security Professional ("CISSP") (Project Manager), Microsoft Certified Systems Engineer ("MCSE") (Senior On-Site Network Engineer), and ITIL Foundation or Help Desk Institute certification and A+ or CompTIA certification (Senior On-Site Help Desk Manager). See AR Tab 8 at 196-97. The Solicitation stipulated that "[k]ey personnel shall be certified and meet all requirements of the position upon assignment to the contract." AR Tab 8 at 196. The Solicitation required that the evidence of certification be reflected in the resumes for key personnel submitted with an offeror's proposal:

> Key personnel are considered to be essential to the work being performed under the proposed contract. The Contractor agrees to assign to the contract those persons who are necessary to fill the requirements of this contract whose resumes are submitted with its proposal, and who are specifically defined as key personnel. No substitutions shall be made except as authorized in writing by the Contracting Officer.

AR Tab 8 at 196 (emphasis added). Amendment 02 changed the CISSP certification requirement stating that, "[i]f the [project manager] does not possess the CISSP, then another on-site key personnel shall possess this certification." AR Tab 10 at 399. 6/

---

6/ The Solicitation specified that "Tier 2 support staff" must have at least one of the following certifications: "CCNA/CCNE for Local and Wide Area Network Management, A+ or CompTIA certification for hardware problem resolution, MCSE for Microsoft product support, ITIL or Help Desk Institute certification for service desk support [and] CISSP for network and workstation security." AR Tab 8 at 198. The Solicitation required that the

CSC originally proposed three individuals as key personnel: (1) [ ], Program Manager; (2) [ Senor On-Site Help Desk Manager; and (3) [ ], Senior On-Site Network Engineer. [ ] had both the MCSE and CISSP certification, [ ] had the A+ and ITIL certification, and [ ] had the MCSE certification. CSC's final proposal substituted [ ] for [ ] as the proposed Program Manager. [ ] had only the PMP certification. See AR Tab 37 at 2190-91. Therefore, as of final proposal date, none of CSC's key personnel had the required CISSP certification. To remedy this problem, CSC proposed that it would provide CISSP training for the Senior Network Engineer during the ninety-day transition period. See AR Tab 34 at 2016. See AR Tab 37 at 2178 ("CSC will infuse a dedicated security specialist to architect security operations during initial 90 day transition, utilize CSC's Global Security Solutions practice to support the team and provide CISSP training and certification for on-site Sr. Network Engineer.") The final range determination issued on March 20, 2008, listed CSC's missing CISSP certification as a minor weakness. See AR Tab 47 at 2656. The final range determination noted: "This weakness should be able to be corrected within one day of opening discussions by substituting a new staffer before award that is CISSP certified so they will have this skill on-board after the 90-day transition." AR Tab 47 at 2565.

In its final proposal, plaintiff listed the three individuals for the key personnel positions. However, none of the identified key personnel had the requisite certifications. 7/ See AR Tab 34 at 2016. Plaintiff included each individual's resume and represented that the employee would be certified "prior to March 31, 2008." AR Tab 34 at 2017-21. The SSA, in the final range determination, termed the lack of certifications for all three key personnel as "one significant weakness." AR Tab 47 at 2566. The proposals of both plaintiff and CSC were treated similarly with respect to certification of key personnel, which was a factor to be considered in evaluation and subject to discussions.

---

6/ (Cont'd from page 19.)

support staff be certified "at contract date or upon the date they begin support for MCC." AR Tab 8 at 198. This language confirms that the Solicitation distinguished between requirements for final proposals and later events. Key personnel were not allowed to be certified after final proposals, unlike other employees.

7/ "One significant weakness is that three of the key personnel proposed do not have the required certifications, the Project Manager, Network Engineer, and the Help Desk leader. Therefore, overall, the proposal is acceptable." AR Tab 47 at 2566.

4. Fairness

As the procuring agency, the MCC must treat vendors consistently to assure fair and equitable competition, an integral part of any negotiated procurement. Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. 388, 395 (1999). Plaintiff postulates that the MCC unfairly allowed CSC to correct deficiencies in its proposal regarding certifications for key personnel, but did not afford plaintiff the same opportunity with respect to open-market items. Tr. at 21. According to plaintiff, the MCC cannot waive the certification requirement for CSC and then hold plaintiff accountable for its lack of certification. Tr. at 25. Through the use of "inartful" labeling, plaintiff charges that the MCC treated plaintiff unfairly by labeling its proposal deficiencies as disqualifying, noncompliant factors, while labeling CSC's deficiencies as curable weaknesses. See Tr. at 65.

Plaintiff's argument fails on several grounds. First, the open-market restriction was a flat-out non-negotiable prohibition that rendered plaintiff's final proposal noncompliant. On the other hand, the certification of personnel came into play in the best-value analysis under the technical subfactor "Staffing." See AR Tab 8 at 177 (stating that an "[o]fferor's discussion on their proposed staffing and recruiting activities . . . [would] include minimum qualifications of proposed staff (to include IDIQ categories) and staff resources to meet MCC's needs"). Second, plaintiff's weaknesses in its staffing plan – as three of the key personnel proposed did not hold the required certifications, see AR Tab 47 at 2566 – did not disqualify plaintiff's final proposal.

While both CSC and plaintiff's final proposals were cited for weaknesses dealing with personnel certification, neither vendor was found noncompliant on this basis. CSC did not propose any open-market items and was found compliant with the RFP. The MCC properly excluded plaintiff from the final competitive range because plaintiff, not CSC, proposed open-market items.

5. Responsibility

Plaintiff argues that if the MCC had any doubt whether plaintiff could actually get the proposed items on the schedule by the contract award date, as promised, the MCC should not have eliminated plaintiff, but referred plaintiff for a nonresponsibility determination under FAR § 9.104-1 (discussing general standards for determining responsibility); § 9.103 (stating that contracts shall be awarded only to responsible contractors and that, "[i]n the absence of information clearly indicating that the prospective contractor is responsible, the contracting officer shall make a determination of nonresponsibility. If the prospective contractor is a small business concern, the contracting officer shall comply with subpart 19.6, Certificates of Competency and Determinations of Responsibility.") and § 9.104-3(a) (discussing

applicability of responsibility standards). Because plaintiff is a qualified as a small business, see AR Tab 2 at 63, a nonresponsibility determination would require that the contracting officer refer the matter to the SBA to decide whether a Certificate of Competency should issue. FAR § 9.104-3(d)(1). See generally Flexfab, LLC v. United States, 424 F.3d 1254, 1256 (Fed. Cir. 2005) (discussing general background of Small Business Act).

Plaintiff predicates a referral to the SBA on the standards for "responsibility" in FAR §§ 9.104-1(f) and 9.104-3(a). Subsection 1.04(f) states that a prospective contractor must "[h]ave the necessary production, construction, and technical equipment and facilities, or the ability to obtain them (see 9.104-3(a))." Subsection 1.04-3(a) states that

> the contracting officer shall require acceptable evidence of the prospective contractor's ability to obtain required resources (see 9.104-1(a),(e) and (f)). Acceptable evidence normally consists of a commitment or explicit arrangement, that will be in existence at the time of contract award, to rent, purchase, or otherwise acquire the needed facilities, equipment, other resources, or *personnel.*

(emphasis added). Plaintiff deems the "or personnel" language as relegating the requirement to purchase scheduled items to an issue of responsibility, because plaintiff was teaming with an entity that would propose no open-market items. See Tr. at 6-7.

Plaintiff cites Data Test Corporation, 54 Comp. Gen. 715 (1975), as authority that the open-market prohibition is an issue of responsibility, not compliance. This opinion was a reconsideration by the GAO of its decision in Data Test Corporation, 54 Comp. Gen. 499 (1974) ("Data Test I"). In Data Test I, the procuring agency issued an Invitation for Bids (the "IFB") "seeking bids on 20 automatic printed circuit board testers . . . [that were] required to be furnished 'in accordance with [the] Purchase Description.'" Id. at 499. The IFB stated that the award would be given to the lowest aggregate bidder. Systron submitted the lowest bid and was awarded the contract. The protestor argued that because Systron did not include the commercial off-the-shelf item, as per the purchase description, its bid should have been deemed nonresponsive. The GAO characterized Systron's intention not to comply with the specifications as an issue of responsibility, not responsiveness. Accordingly, Systron should have been declared nonresponsible, given that the GAO did not find a reasonable basis for which the agency could conclude that Systron "had the ability to" meet all the IFB requirements. Id. at 503.

Following the GAO's decision in Data Test I, the Government and Systron filed requests for reconsideration. The GAO granted the request. Data Test Corporation, 54 Comp. Gen. 715 ("Data Test II"). Both the Government and Systron questioned the GAO's

interpretation that the commercial off-shelf item was an IFB requirement. Id. at 720. The GAO responded that "there was no requirement that the tester to be furnished be a 'commercial off-the-shelf item' as of the date of award but rather only that it be so as of the date set in the IFB for delivery." Id. at 722. The GAO reasoned that its decision in Data I reflected that a bidder must demonstrate, before award, that it has the capacity or ability to deliver the item specified in the IFB, i.e., the bidder must provide evidence that it is responsible, id. at 720, albeit in a tortured exposition that served to blur responsiveness and responsibility, as exemplified by plaintiff's attempt to wrest a rule that could be applied to the case at bar. Because they provide no useful guidance, the court declines to rely on the two decisions. See Burroughs Corp., 617 F.2d at 597 (stating court not bound by views of GAO).

The Data Test decisions also are distinguishable from the case at bar because they dealt with the issue of capacity to perform. In contrast, the open-market restriction was a requirement for pricing, not a matter that related to personnel proposed. See AR Tab 10 at 373 (stating in Amendment 02 under heading "Business/Price" that the "[o]fferor shall submit a copy of its applicable SIN 132 51 GSA Federal Supply Schedule with its proposal, to include any other FSS from prime or subcontractors to ensure compliance with the total solution to the MCC requirement . . . [o]fferor may provide pricing beyond its GSA FSS expiration date . . . ."); AR Tab 15 at 791 (listing open-market requirement as "pricing" in plaintiff's initial proposal); AR Tab 41 at 2126 (listing open- market requirement as "pricing" in plaintiff's final proposal).

The Solicitation detailed a requirement under the pricing criterion, and plaintiff's final proposal was noncompliant. The MCC did not treat CSC differently with respect to an issue of compliance. Plaintiff and CSC were treated similarly with respect to a staffing matter allocated to resolution through discussions.

6. Task order

Defendant takes the position that the contract is a task order, not a negotiated procurement, such that the MCC is under no obligation to make a referral of nonresponsibility to the SBA. Tr. at 49-51. See FAR § 8.404(a) (stating that FAR Part 19 (Small Business Programs) do not apply to FSS contracts). Defendant relies on Ellsworth, 45 Fed. Cl. 388. The protestor in Ellsworth argued that, although the contract award originally was envisioned as an FSS task order, the Government actually conducted it as a competitive negotiated procurement. Plaintiff was not successful because the letter accompanying the solicitation in Ellsworth unambiguously stated that the award was made under FAR Part 8, governing the FSS program procurement, even though the agency

incorporated into the solicitation some formal elements traditionally used in a negotiated procurement. See id. at 393-95.

Defendant pointed out during oral argument that the MCC used the term "GSA task order" nine times on one page of the RFP. Tr. at 50 (citing to Amendment 02, AR Tab 10 at 316, which used the term "GSA Task Order" ten times). Although the MCC used "task order" in the RFP and invited vendors listed on the GSA FSS, the Solicitation unambiguously stated that it was a negotiated procurement. AR Tab 8 at 107. The Solicitation's interchangeable use of the terms "contract" and "GSA task order" throughout the proposal, see, e.g., AR Tab 8 at 121-25, 134-36, indicates that the MCC planned to use GSA task orders as a method to implement the contract, not to structure the nature of the contract arrangement. Moreover, the Solicitation included detailed "statement[s] of the project requirements, an explanation of the selection process, and a guide for scoring criteria," all of which are typical attributes of a negotiated procurement. Ellsworth, 45 Fed. Cl. at 394 (stating that contract did not utilize any of these elements, but explained project requirements in one sentence and selection process in less than one paragraph). Even if the Solicitation is a task-order procurement that immunizes the procurement from referral to the SBA for a nonresponsibility determination, the court already has held that the off-schedule restriction does not constitute an issue of responsibility.

7. Defendant's reliance on inaccurate information

Plaintiff challenges the MCC's competitive range determination on seven grounds, arguing the MCC's action was arbitrary and capricious because its final range determination was based on inaccurate information. Plaintiff contends that the MCC: inaccurately evaluated plaintiff's proposal as having a significant weakness; inaccurately determined that plaintiff was noncompliant with the open-market-items restriction; inaccurately determined that CSC's final proposal was fully compliant; inaccurately gave CSC an "outstanding" technical rating; incorrectly changed plaintiff's past performance risk assessment; and relied on inaccurate information in assessing the risk of plaintiff's staffing and help desk plans. Pl.'s Br. filed July 31, 2008, at 23-29. During argument plaintiff emphasized that the MCC inaccurately determined that plaintiff would not provide full help desk coverage and that it did not have an existing technical facility in Houston. See Tr. at 32-33.

Plaintiff complains that the TEP incorrectly determined that plaintiff was not proposing to provide technical "24/7 coverage." See Tr. at 32. Plaintiff incorrectly characterizes the TEP's finding. The TEP's final technical evaluation identified as one of the weaknesses in its final proposal that plaintiff proposed to have three on-site desk technicians only from 7:00 a.m. to 7:00 p.m. See AR Tab 44 at 2483. Although plaintiff did propose "24/7/365" coverage, the full coverage it proposed was only a "basic telephone

support [not on-site desk coverage] person who opens a ticket for every automated help desk inquiry, phone, email, or fax received." AR Tab 34 at 1985.

Plaintiff argues that the MCC inaccurately faulted plaintiff for developing a new facility in Houston to support the MCC contract. In the final range determination, the SSA noted that "[t]here is some risk the proposed plan for help desk support may not be effective because it is a new facility being developed to support the MCC and others." AR Tab 47 at 2566. However, plaintiff's technical proposal stated that it will "build a completely new *hosting* environment in Houston . . . the physical equipment will not have to be moved . . . . Once the data circuits are in place and the new virtual datacenter is on-line . . . ." AR Tab 34 at 1974 (emphasis added). Thus, the SSA inaccurately determined that plaintiff was developing a new physical facility when, in fact, the "new facility" was a virtual one. The contracting officer did not recognize this mistake until the post-competitive range debriefing with plaintiff held on May 22, 2008. AR Tab 61 at 3140 (reflecting in notes that finding questioned).

As plaintiff conceded during oral argument, the evaluating process reveals "no silver bullet" and any of the information that was inaccurately relied by the MCC, at most, would change one of the ratings. Tr. at 34.

The court has examined all of plaintiff's claims and arguments against the administrative record. Plaintiff's other contentions are either repetitive of the arguments addressed above or deal "with the minutiae of the procurement process in such matters as technical ratings [ ], . . . which involve discretionary determinations of procurement officials that a court will not second guess." E.W. Bliss v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996). For plaintiff to succeed on the merits it must prove that the final range determination was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The court's examination of the record and analysis of the law confirm that plaintiff has failed to meet this burden.

V. Other factors necessary for injunctive relief

While success on the merits is the most important factor, "[n]o one factor, taken individually, is necessarily dispositive." FMC Corp., 3 F.3d at 427. "[T]he absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial." Chrysler Motors Corp., 908 F.2d at 953. Besides (1) success on the merits, injunctive relief requires a plaintiff to demonstrate that (2) it will suffer irreparable harm if injunctive relief is not granted; (3) the harm to plaintiff if an injunction is not granted outweighs the harm to the Government if an injunction is

granted; and (4) the injunction is not against the public interest. PGBA, 389 F.3d at 1228-29; FMC, 3 F.3d at 427.

Plaintiff has shown irreparable harm. "An action at law only allows recovery of 'bid preparation costs in a suit for damages, but not loss of anticipated profits,' leaving a bid protestor irreparably harmed." Bannum, 60 Fed. Cl. at 730 (quoting Essex Electro Eng'rs, Inc. v. United States, 3 Cl. Ct. 277, 287 (1983), aff'd, 757 F.2d 247 (Fed. Cir. 1985)). The financial harm to plaintiff is displaced by the hardship that an injunction would impose on the MCC because of plaintiff's failure on the merits and the significant expenses that the MCC would be forced to pay if a permanent injunction were issued. Finally, the court must consider whether an injunction would be in the public interest. The MCC made a rational decision to exclude plaintiff from the competitive range. The agency rationally determined that the proposal by CSC selected for inclusion in the final competitive range offered the best value to the MCC.

## CONCLUSION

Defendant's cross-motion for judgment on the Administrative Record is granted, and its motion to dismiss for lack of jurisdiction is denied. Plaintiff's cross-motion is denied. Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1. The Clerk of the Court shall enter judgment for defendant.

2. By September 12, 2008, the parties shall identify by brackets any material subject to redaction before this opinion issues for publication.

No costs.

s/ Christine O.C. Miller

______________________________________

**Christine Odell Cook Miller**
Judge